Good morning everyone. Good morning. Call the first matter, FOP v. City of Camden. Good morning, may it please the court. My name is Greg Zeff. I'd like to reserve three minutes for rebuttal. I'm sorry, three? Three. Okay. Thank you, Your Honor. This case involves three police officers and...  What are you arguing? Thank you, Your Honor. I'd like to start by talking about a couple of things that are not really clear from the record. One of which is that when my clients made their complaints, before my clients made their complaints, they were told... What complaints are you talking about? The original... The comments on the forms? The comments on the forms. Okay. When they were informed that they were going to be subject to discipline if they didn't get their numbers up, they were told they would have three months to get their numbers up. That is something on page 514 through 517 of the record. The counseling form they were given, you have three months. Yet within 30 days, they were transferred. And the court found that and all the other evidence in this matter to be too attenuated from their original complaints. Why doesn't that hurt you? Because your theory is that the causal... The temporal nexus is so telling you, so suggestive, that it gets you past summary judgment and causation. But if they're told that they have three months to get their numbers up, but they're fired before the end of that time, doesn't that suggest that there are five reasons, can you say, for something other than the numbers? No, Your Honor. What happens is they are told you have three months to get your numbers up. They then write their memos. One saying, quotas are illegal. And then 17 days later, they're retaliated against, if you will, by being transferred at that point. And what are they told? They are told, get your numbers up. Officers will be monitored for the next three months. Can you say something like that? That is their specific supervisor at the time. Is that the information that the district judge did not credit because it was hearsay? No, Your Honor. That is not the hearsay information. The hearsay information was that there were a number of lieutenants and a number of sergeants, in fact I believe the number is six, who told them specifically you are being transferred and these actions are being taken against you because of what you complained about. It is our position that that is not hearsay at all. In fact, our position is that under Rule 801D, those are admissions. Well, would it matter if it was hearsay? It shouldn't matter if it was hearsay, and Your Honor has written on that very topic. There are, in cases such as this, if it is hearsay and the person who was alleged to have made the comment is available at trial, it's considered for summary judgment purposes to be evidence. And we'd urge the courts to find, in fact, that it is evidence in this case because the causation here I submit is rather strong with or without that, I call it an admission, the Supreme Court called it hearsay. In this case, we have 17 days between the first complaint and the first retaliation. And the retaliation continues for a period of a year, and it continues in the form of not just transfers, and there are several transfers involved for Officer Galliazzi, but there are other activities. For instance, both Galliazzi and Holland went out on leave. Holland goes out, he takes FMLA, and he's put on the chronic sick list within months. Let me ask you, what do you think you're, you've got the court of law, the CEPA claim, the First Amendment claim, the FMLA claim. Which of those four do you think is your strongest argument as you go to a jury? Well, I think the strongest argument would be the CEPA slash First Amendment claims, Your Honor. You don't need First Amendment claims, though. CEPA is a stronger claim. CEPA is wrong. CEPA is a stronger statute. All right. So I would say CEPA would be our strongest claim. The quota claim is mostly related to the FOP, and it wasn't addressed really below, other than in glancing fashion, that no reasonable person could read this quota statute to apply to a mere inquiry. And I would submit, Your Honors, that that kind of misses the boat and that the court took a very narrow look at both the quota statute and the facts here, because the facts in this case are that we're not addressing the actual policy. I don't think anybody would say that the policy here of going out and doing mere inquiries and gathering information from people who volunteer it is wrong or unconstitutional in any way, shape, or form. But what we are challenging is when you tell police officers that your livelihood depends on getting a certain number of community policing cards per shift. But that still wouldn't get you under the statute, though, right? The statute is limited to the number of arrests or citations. I thought you were arguing that not so much the application of the statute on its face, but the statute as applied because it was being applied in a way that went beyond what was being articulated in the policy and there was pressure there to actually get citations, particularly in vehicle stops. That's correct, Your Honor. Not just vehicle stops, but you are correct. The actual quota policy, if you will, and we call it a quota because my clients call it a quota, but the policy of these directed patrols is what is being challenged here. My clients called it a quota. They also said in the lawsuit below in the state court that this was a constitutional violation. And somewhere in between there, I submit that it could be both. However, were the citations, were they required? There is a matter of factual debate about that. It does not appear that a citation was required every time someone met a citizen. However, there were supervisors who told their officers that every time they stopped a vehicle, they were to give it a citation. And there were supervisors who believed that citations were required. There was never any requirement of that. One of the issues we have in the case that we would bring up factually at trial is the supervisors and the administration in this case kept everything very vague, purposefully so. We need you to come up with three low performers. And yet there is nothing in writing that is coming from the administration, the chief and his deputies, Cuevas and Lynch. It does not specify what a low performer is. However, Deputy Chief Lynch says if you get your policing card, you are never going to be a low performer. If you hit your quota, you are never going to be a low performer. So we know that also from Chief Lynch that there is a belief in this department, all the way down the chain from Lynch to the patrols, that there is a quota system and that you need to get these cards. That quota system, as of his deposition in 2012, was something that he testified that officers still maintained at that time. They believed, not all of them, but certain patrolmen, certain supervisors believed that they were required to go out and get these cards. Now, it is our position that that is beyond a chill to the community and everyone else in the situation. If your livelihood depends on getting a certain number of cards, it is no longer a mere inquiry. The case law in New Jersey says that whether or not it is an unwarranted, overbearing police intrusion is something that should be balanced. That is State v. Priveto, 203 NJ 16. And who does the balancing? The court. The court, not the jury? The court does the balancing as to whether it is a mere inquiry or whether it is an unwarranted and overbearing police intrusion. Now, I think it becomes an overbearing police intrusion if you are sitting on your stoop in Camden and a police officer goes by and says, excuse me, can I have some information, can I talk to you? And whether you say yes or no doesn't matter, but 20 minutes later another police officer comes by and asks you the same thing. 20 minutes later another police officer comes by and asks you the same thing. If you sit on your stoop all day long in Camden, you are going to be asked by every police officer for your information. Now, you can say no and smile and keep going, but that police officer is under pressure to get your information. So this is not a situation like someone at a mall who is taking a survey with a clipboard. When they say, excuse me, can I ask you a few questions, and people walk by that person or they stop and give them a courtesy of a couple of answers. This is a police officer with a badge and a gun in a crime-ridden city who is asking you if you have a few minutes to answer a few questions. Nothing wrong with that at that point, but keeping in mind that the police officer is now under severe pressure to get that information from you, and there is a burden now because if you are standing out there for a long period of time, you are going to get asked over and over again, perhaps even by the same police officer, the same questions. So you are saying that the directive patrols, were the officers necessarily expected to make arrests or citations or do tarry stops? The answer is they were not expected by the administration to do that. However, the perception on the street was different, and the administration knew that. No, no, that gets you into a problem, because if the perception on the street is not coming from an expectation of the administration, how does that get you under the cause of action? Well, the cause of action is that they knew this the entire time, and we have several causes of action. The officers on the street knew this? No, the administration knew this. Chief Lynch says that the chief of the department knew, and he as deputy chief knew from 2008 to 2012, which is the period of the discovery in this case, that this was the perception on the street, that more than just an inquiry was... On the street meaning? Meaning with the patrolmen. All right. And really the chief of the department frames my case better than anyone else. When the chief of the department is asked whether or not officers, if they were given a quota, if they were told you must go out and get this number of cards, whether or not that would be constitutional, the chief of the department says, no, it wouldn't. That would be intrusive into people's freedom. So... Where is that in the appendix? That is... Give me one moment, Your Honor. If you want to, you can just have rebuttal. It wouldn't take me ten minutes. I'm sorry. That is in our reply brief, Your Honor. But the reply brief doesn't do it. It's got to be citing something that's... It quotes the entire section. Okay. That the chief of the department recognizes that the practice, not the policy, if followed that way, would be wrong. And we've shown that that was the practice through both Lynch and through the testimony of others. Lieutenant Sasanovich says there's a perception on the street that this was a quota, that this was something that had to be done. There were funnels. But how does a perception on the street lead to a reasonable belief that a practice or protocol was in violation of law, which is what CEPA requires? I'm not sure respectfully that that is the specific standard that should be applied in the case. CEPA prohibits any employee from taking, quote, any retaliatory action against an employer from taking any retaliatory action against an employee because the employee objects to or refuses to participate in any action, policy, or practice, which the employee reasonably believes is in violation of a law. And, Your Honor, the Supreme Court of New Jersey and this Court have recognized under Dwozenaar, which is the Supreme Court of New Jersey case, that what must be identified is a statute regulation or public policy that closely relates to the complaint of conduct. And that's what is meant by the objective standard. Have they made a complaint that closely relates to a statute or a law? But the law is a quota law, which deals with arrests and citations. I mean, you're saying that the directed patrol policy in and of itself isn't violative. It's the way that some people expected the officers to perform their duty or what? The policy as written is not violative. It's the practice of we're going to go out and we're going to require you to get a certain number of cards each shift. That is not written in the policy. There's an expectation. There's a memo that says that we're expecting this. But the policy of directed patrols is you're going to go out and you're going to meet the community and you're going to talk to the community. And when you're on patrol, you're expected to make contact with the community. There's nothing wrong with that. Obviously, there may be something quite good from that.  Exactly. And what I was getting at, Your Honor, is it's closely related to the complaint of conduct. Is it just a quota? My clients allege that this was illegal conduct. And they allege, not just in the complaint in New Jersey, but elsewhere, that this is unconstitutional conduct. I'm sorry. What, and I think this is what Mr. Yankovic was trying to get at. What part of the this are you saying is unconstitutional? Pressuring officers to just go up and have conversations with people sitting in this tube all day? Pressuring officers to get a certain number of contacts per day. Even if they did not result in citations? Even if they didn't result in citations. But some of them did. And there was a complaint about the general practice. We can't do that. We can't have funnels for every car to stop by and have some of our superior officers ordering us to cite every single person that goes through the funnel whether they did something or not. You used the word cite. That's what I'm trying to get to. That would be a citation, Your Honor. But having a conversation with somebody in this tube, that's not a citation. That's a conversation. That's correct, Your Honor. Where does the citation come into play? The citation comes into play with the traffic stops. Okay. That's why I initially phrased my question in terms of vehicles. And was the funneling a typical thing that was done on a normal basis? That is, the funneling of the cars? I am not sure that it was ever done to this extent in this way. Funneling was done, I know, for DUI investigations and other situations in other areas. But I don't know whether it was done in Camden, Your Honor. Judge Ambrose, I just want to get back to the closely related to the complaint of conduct. We are here debating whether or not this was a constitutional violation, whether or not it was appropriate or not. And I submit to Your Honors that defense counsel in this case is going to get up and take the opposite position. But I'm arguing this before the Third Circuit right now, and there seems to be some debate about it, whether you agree with our position or not. I submit that it is a colorable, reasonable argument that we're making here. Under SEPA? Yes, under SEPA. That my client's complaints were colorable and reasonable complaints that closely relate not only to the quota statute, but to the Constitution of the United States and the laws of New Jersey that relate to searches and seizures. And that is all that is required to make their speech protected under SEPA, is that it closely relates to the – that there's some regulation, public policy statute that relates. Whether or not they're correct or not is not the issue. And the judge below seemed to fixate on whether or not there was a violation under the quota statute. And once that was reached, it appeared that the judge had made up his mind. That is not the standard. The standard is closely relates to the complaint of conduct, whether there's a statute, regulation, some policy that – And you say that this, at least under SEPA, that there is authority from the New Jersey Supreme Court that says that there are threshold determinations, and if they're met, then it becomes a jury question. I do. There's the Dworzenor case. There's also the Waters case before this court which says causation is left to the jury. But also Judge Barry in the Blackburn case says that SEPA doesn't require the court to determine whether the wrongful acts are true. That would be the antithesis of the intent of the statute. And there's also the Melman case in the Supreme Court in New Jersey from 1998 that says SEPA's goal is not to make lawyers out of conscientious employees. So the fact that they have made these complaints and whether or not they're right or wrong about the quota statute itself, it closely relates to that statute. It closely relates to the Terry stops, the mere inquiries that are going on. And they – It's really not even a Terry stop. It's just a weird animal. I don't know what it is. It's kind of a – if they didn't have badges and guns, it would just be some old-fashioned busybody. But it's not a Terry stop. It's not a checkable suspicion. It's not even an invalid Terry stop because they're not trying to justify it based upon some fruit of conduct or something. It's just – it's weird. And the camp of the FLP, the union body, was not opposed to going out and collecting community policing cards and was not opposed to being on the streets, greeting people and talking to people. They were opposed to the fact that they were being pressured. If they didn't get a certain number of cards, they were considered low performers. They opposed the practice of seeing a bunch of people in line at a restaurant, a fast food restaurant, and having to stop each one of them and ask them if they would pull out a card because they needed those cards. They were opposed to senior members of the administration driving around, making sure that they stopped every single person that they saw on the street, whether the person was engaged in some other activity or not. In reality, that – I'm wondering how much of what you're arguing is a privilege. I understand that's your client's argument, but they couldn't possibly in a city like Camden stop every single person they saw on the street. The Ben Franklin Bridge would back up. You couldn't do it. I mean, one of the examples from the brief is Officer Holland was walking by a person, and he said, hi, how are you? And the person put his head down and kept walking. And Inspector Cuevas saw that and called and said, why didn't you stop that person? And that's the type of practice that they wanted them to engage in. If the person looks down, walks away, excuse me, sir, I need to ask you some questions. I'd like you to fill out this card. No, I don't want to fill out the card. Okay, you can move on. Except now Officer Holland is in the position where if he doesn't get that guy's card, he better get the next one. And if he doesn't get that one, he better get the next one. And what happens to a police officer in the middle of the night who's patrolling an area where there aren't people? His numbers are going to be low for that shift, so he better make up for it on the next shift. And the next shift, because if you've got an overnight and you're in an area where there's nobody around, that's going to be a problem for your career. Is the policy still in effect? As far as we know, Your Honor, in our last briefing in 2013, John Williamson, who was vice president of the FOP for the state, said that he believed it was. We don't know whether it's still in effect in 2015. We do know that based on this litigation that in 2012, Deputy Lynch videotaped all of the supervisors and asked them what their understanding of the policy was. Because as of 2012, there was a concern based on this litigation that no one really understood the policy. Again, this policy is valid. We're not challenging that. It's the practice that they're taking this policy and putting, if you would, a gun to the head of the police officers to collect data from people. It would be interesting to see over quite a while if that can be doubled in time. We have some minutes left. Thank you, Your Honor. Thank you. Good morning, Your Honor. Good morning. What the district court did here- I want to say your name for the record. Oh, I'm sorry. John Eastlack of the firm of Weir and Partners, on behalf of the city of Camden and the other remaining defendants. Is the directed patrol policy still in effect? Well, the directed patrol policy is not in effect with the city of Camden because the city of Camden police department was disbanded in April of 2013. There's a county police department that's in effect. That was something that was addressed in Judge Hillman's opinion. It was a footnote, I believe, on page two of Judge Hillman's opinion below that indicated that there were some inquiries that were made during the course of this litigation as to whether or not the policy was continuing and what effect the ending of the police department had on this litigation. If any, that issue was briefed. The judge determined that it didn't cause any change in the arguments that were already made before the police department had been disbanded, and they went to a Camden countywide police department, which the Camden City Police Department is now, I'm going to say it's the Camden County Police Department Metro Division, which is the division that patrols the city of Camden, which has a greatly differing makeup from the officers that were originally there. And they have not adopted the policy of the city police? I don't know that they've adopted this policy, Your Honor. They have completely different policies. The county policies are, they have a new code book. They have new policies. There have been substantial changes with the policing in the city of Camden with the Camden County Police Department. Now it does have the same chief, which is Chief John Scott Thompson, is the chief of the Camden County Police Department Metro Division. That has not changed. I don't understand what Judge Helman did with the hearsay rule. I'm not quite sure what he had in mind when he ruled that you couldn't get past summary judgment if you were relying upon hearsay evidence. Where is that coming from? Well, Judge, I think it comes from the Blackburn opinion that talks about hearsay evidence, but what the plaintiffs have posited here really is more rumor and innuendo as opposed to certain hearsay evidence. I mean, from the plaintiff's argument here, which is also contained within the plaintiff's brief and supplemental brief, is that there was a perception on the street that the policy and the manner in which it was going to be carried out was somewhat different than the policy as it was written and therefore would violate the New Jersey statute, which is under 40A-14-181. I'm sorry. Go ahead. Why wouldn't it be a party admission or an opponent's admission, these statements? Well, the rumors, again, I'll put it, rumors on the street of that there were individuals within the police department that were indicating that the reason why they were moved from directed patrol to regular patrol, they weren't terminated in their positions, was because of their complaints about the policy. Those indications were by individuals, I don't believe, that could bind the department or make policy for the police department. There would be a party admission. There was no supervisor who said, made those statements? Well, the plaintiff relies, I'm going to say, substantially upon statements that were made by Deputy Chief Lynch and also a Lieutenant Sasanovich, which is quoted extensively in the reply brief. Neither one of them, I mean, both of those individuals have indicated, particularly Lieutenant Sasanovich, that they believe that the officers had a perception that unless they met their 18 to 27 cards per shift that there would be adverse employment action against them. But they don't, even Lieutenant Sasanovich doesn't point to specific individuals that indicated it, and he doesn't indicate that he said that. And, in fact, Deputy Chief Lynch, which the plaintiff relies upon heavily for its argument about meeting the requirements, the quotes that are set forth in the brief are well out of context of what Deputy Chief Lynch's testimony was. Specifically, in appendix pages 602 and 603, Deputy Chief Lynch provides testimony pages 44 through 48, where he specifically indicates that it was not required that you get this certain number of cards. The plaintiff has reiterated and reiterates in its brief that says that if you got these number of cards, then you weren't going to be considered a low performer. But when Deputy Chief Lynch is specifically asked this question in deposition, which the plaintiff relies upon, his answer was, well, I think the expectation was, and I'm quoting, when you're not on an assignment, the first and foremost is to identify and engage conditions of crime and quality of life behavior. That's what he said, first and foremost. Let's go back to the lawsuit was filed in, what, March of 2009? Yes. And there were a number of activities thereafter that Holland, Galiazzi, and Williamson claim were in retaliation. Holland was denied bike patrol, placed in a chronic sick category, marked AWOL. There was an internal affairs investigation. Galiazzi had a schedule change, claimed that he abused sick leave, vacation revoked. And Williamson had internal affairs investigations. And there was a statement. Holland testified that his supervisors, Sasanovich and Carmichael, told him that the IA investigation, quote, was retaliation, close quote, and that Sergeant Jefferson told him that, quote, someone was coming after him. Now, the court says, I mean, that sounds like retaliation. And the court said you can't consider the testimony because it's hearsay, but that's not correct here because it's summary judgment. And was it rule of evidence 801D2D and Blackburn say that you can consider it for these purposes for summary judgment? We've got all kinds of cases that say that. Including Blackburn. Including Blackburn. So doesn't this case just go back on that at least? Well, I don't think it does go back on that. First of all, do you think that the judge was correct in saying that he could not consider Holland's statements as to what others told him pertaining to retaliation because it was hearsay? I don't believe that specifically, no, Your Honor. What I do believe, however, is that the individuals that they're seeking to say that makes policy and would bind the city and bind the upper level management of the city of Camden, like the chief of police, I don't believe that these are admissions. I believe that the court could consider the alleged hearsay statements that aren't in the innuendo that they talk about or perceptions on the street. When you've got Jefferson, Sosnovich, and Carmichael making statements or purportedly making statements, and you can consider them on summary judgment, but the district judge says he will not consider them because he can't consider them, and that's incorrect as a reading of our cases, what are we to do? Well, I don't believe you have to get to that point because I think what the critical part of that is what they're talking about is, in effect, somebody saying there's smoke and here's the gun. We're telling you, yeah, you did things here we're not happy with, so it's retaliation. That's an employee making that statement. Why can't that be considered for summary judgment purposes? Even assuming that that can be considered for summary judgment purposes, even under the opinion in Blackburn, let's assume that that is correct, and Your Honor has indicated that the court can consider hearsay. What the district court did find is that there was no substantial nexus between the claim of retaliatory action and the adverse employment action that was claimed to have been visited upon these officers. There has to be some nexus between the adverse employment action and the claimed whistleblowing activity. Well, isn't that a jury? It's tenuous, it seems to me, and I would agree with that, but it seems like it's at least enough to let the jury make that consideration, even based upon temporal proximity. It's not overwhelming evidence, that's for sure, but it seems close enough under at least one of our cases, which allows them to get past summary judgment. But to make the argument to the jury, look, the fact that it happened within 17 days, I thought it was closer than that, it's not enough to establish causation. The jury may buy it, may not buy it. Well, Your Honors, I don't want to be making the argument to the jury. You make more money if you make the argument to the jury. But if you get to the underlying policy itself, as written, and I think the plaintiffs have conceded, is a policy that's valid under New Jersey law and federal law. It doesn't abridge the federal or state constitutions to have these inquiries, and that goes to both State v. Seriani, which is a New Jersey Supreme Court case, which indicates that police officers are legally entitled to make inquiries of people. David, this is very different. We're not talking just about inquiries, but Mr. Ziff's submission is that there is pressure to make constant and repeated inquiries, and if you do not do that, there's going to be an adverse employment action. That's very different than just community policing, which is what you're describing. But there is no evidence that the plaintiffs came forward with and presented to the district court below, nothing contained within the Deposition Testament that was presented to the court below, that anyone from the community ever complained. There wouldn't have to be. Well, there wouldn't have to be, but what the plaintiffs have indicated as to support their claim that the, I want to say, management of the police department was on them to repeatedly make inquiries of individuals. The example of the person on their stoop all day for three hours and being contacted by multiple law enforcement officers, there was no evidence below except this example that is given that that occurred. The police officers never came forward with testimony to demonstrate that that took place. No individuals presented or deposed or provided any type of affidavit or any other information to the court below that indicated that they were repeatedly approached by law enforcement officers and that it was because the officers had to, there was some type of connection between that. That is all in the form of hypothetical example. And the fact of the matter is that the policy- Does that matter under the SEPA, though? I'm sorry, Your Honor? Does that matter under the SEPA? I think it matters because there still has to be a reasonable belief by the officers that the policy was in fact illegal or improper. And the fact that the officers, the written policy says what it says, it is not illegal as they admitted. The case law, and I understand that SEPA doesn't require police officers to become attorneys and understand the fine legal arguments, but it's pretty clear that the case law for a long period of time in the state of New Jersey is that mere field inquiries of individuals where they're not seeking out any or investigating any crime or engaging in any type of peri-stop in any way and just gathering information from individuals is permitted. It's under State v. Seriani, State v. Stovall, State v. Dangerfield, which are all appellate and Supreme Court decisions of the state of New Jersey that indicate that those mere inquiries are not violative of the Constitution and don't violate the quota statute. Can the inquiries ever reach a point, though, where that's no longer true? I assume that they could. They could be improper under perhaps other state laws or state statutes. I guess there could be a police harassment where police repeatedly just come to an individual. We don't have any genuine examples of that. I mean, again, these were hypotheticals that were posed to the district court below at the time of summary judgment and the papers submitted there, but there were no actual examples testified to about that type of activity or the manner in which the policy was carried out by the Camden City Police Department. And, in fact, the reason for the movement, again, these officers were not demoted. These officers were not put in positions that were varying in any way from being a patrol officer doing what they're doing instead of patrol officers. Two of them lost 10 percent of their pay. I'm sorry, Your Honor. There was a reduction in pay of 10 or 11 percent being moved from one category to the other. From directed patrol to regular patrol, that is correct. But these officers were not demoted. They were not disciplined. They did go through disciplinary proceedings for their performance. But the reason it was provided, Your Honor, was not just as to the not meeting the 18 to 27 contacts with citizens as was required per shift. It was that they were not engaged in the community policing, that they were not engaged in the patrol that was supposed to be done out there in terms of interdicting crime, which is one of the things that these directed patrols were supposed to do. Those were the reasons that were given, and that is what's stated in Deputy Chief Lynch's testimony, that those were their first obligation to interdict crime and to make sure that the quality of life zone, these quality of life zones where these officers were patrolling, the quality of life was maintained. It was only the third category below that was having these community contacts and gaining the requisite number of cards. And it was actually in the policy itself, Section B of the policy, it indicates that it recognizes that based upon that particular officer's patrol activities at the time, that they may not be able to meet the requirements. So it wasn't a bar none, you have to meet that requirement. It specifically gives the officers an ability to explain why they aren't meeting their obligations, and it could be because of the assignments they had on that particular shift, and it was taken into consideration in the written policy itself. Mr. Eastlack, thank you very much. I'm going to turn it around to you on rebuttal, since Mr. Eastlack had a much keener observance of the red light than you did. I'll be very, very brief. We submit that causation is a matter of fact in this matter and not a matter of law, and the case law does support that. The two quotes that I was referring to earlier on page four and five of our reply brief, one from the chief says, your question, would it be a violation, do I believe it would be a violation of the Constitution? Yes. To require officers to go out there and stop X number of people a day? Yes. Yes. And then why? Because people have a right to be free in society. Well, that doesn't help you. That's just the chief saying that you can't do what you're alleging you were doing. That is what we allege the practice was, that you have to go out and stop X number of people per shift. All right. Mr. Eastlack's argument is where is the evidence that that, in fact, was the practice? That was the practice as based on what we have discussed previously, that is people were told, this is what you must do per shift. There were administrators going out and telling people, such as Chad Holland, who walked by somebody who said, how are you, and he looked down, that's not acceptable to us. You have to engage each person you see. In fact, Chief Lynch testified, it's on page 13 of the reply brief, 604A of the record, for what period of time were you aware that there were supervisors telling patrol officers that there was a quota? His answer was, I'm sure it was from the beginning of this process, and then a little further on he says, there's probably supervisors today that have that conversation with their officers, so I'm going to say it continues today. That's the situation, Your Honor. The patrolmen on the street were practicing something that was different than the policy. The administration knew about it in 2008, allowed it to continue through 2012, and in 2009 my clients stood up and said, we'd like something done about this, this is not right. Isn't that refreshing today that police officers would stand up for citizens and say, wait a minute, what we're doing in law enforcement might not be right here. Again, might not be right is probably the correct term to use when we're looking at a SEPA case, because whether or not it's right is a matter of reasonable belief. Thank you, Your Honor. Thank you, Mr. Zell. Thank both of you for being very helpful. I think it's a very interesting case. We'll take a matter under advisement.